IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS

| | | |
|---|---|---|
| **DARRYL DURR,** | * | |
| Plaintiff, | * | **Case No. 2:10-CV-00312** |
| v. | * | **Judge Smith** |
| **RICHARD CORDRAY, et al.** **DEFENDANTS** | * | **Magistrate Judge Abel** |
| Defendants. | * | ***Death Penalty Case*** |

## JOINT MOTION TO DISMISS
## BY ALL DEFENDANTS

Defendants Cordray, Strickland, Mason and Fuerst jointly move the Court, pursuant to FRCP 12(b)(6), to dismiss the complaint for want of jurisdiction, and for failure to state a claim under the federal constitution. The motions for Temporary Restraining Order, Preliminary Injunction, and Stay Of Execution should be denied. A memorandum in support follows.

Factual background of the State court proceedings are initially provided.

Then, grounds to dismiss are stated in the following order:

(a) Durr's pleadings should be dismissed as a second habeas petition under *Nelson v. Campbell*, 541 U.S 637 (2004);

(b) Since there is no constitutional right to DNA testing, Durr's pleadings fail to state a claim under the federal constitution, *District Attorneys Office v. Osborne*, 129 S. Ct. 2308, 2319 (2009);

(c) Where there is no constitutional right to post-conviction relief, Durr's pleadings fail to state a claim under the federal constitution, *Pennsylvania v. Finley*, 481 US 551 (1987);

(d) Review of Durr's complaint, as calling for review of the propriety of state court proceedings and adjudication, is barred by the *Rooker-Feldman* doctrine enunciated in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 125 S.Ct. 1517 (2005).

    Respectfully submitted,

**RICHARD CORDRAY**
**Ohio Attorney General**

  s/Stephen E. Maher
**STEPHEN E. MAHER* (0032279)**
***Lead Counsel***
**THOMAS E. MADDEN* (0077069)**
*Co-Counsel*
**Assistant Attorney Generals**
Capital Crimes Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215
(6l4) 728-7055; (614) 728-8600 (fax)
stephen.maher@ohioattorneygeneral.gov
thomas.madden@ohioattorneygeneral.gov
**COUNSEL FOR DEFENDANTS**
**CORDRAY AND STRICKLAND**

**WILLIAM D. MASON**
**Cuyahoga County Prosecuting Attorney**

s/ Matthew E. Meyer
**MATTHEW E. MEYER (0075253)**
**Assistant Prosecuting Attorney**
Justice Center, Courts Tower
1200 Ontario St.
Cleveland, OH 44113
(216-443-7800)
mmeyer@cuyahogacounty.us
**COUNSEL FOR DEFENDANTS**
**MASON AND FUERST**

2

## **MEMORANDUM IN SUPPORT**

### *Factual Background*
### *State Court Postconviction DNA Proceedings*

On August 6, 2009, Durr filed an application for DNA Testing pursuant to R.C. 2953.71 *et seq.* before the Cuyahoga County Court of Common Pleas. In his application, Durr requested DNA testing of "[r]ape kits in the two prior rape cases, blond hairs found on the victim's body, my clothing that was collected, the blanket that the body was wrapped in, the clothing found on the victim, and any blood or other evidence found on or around the victim's body." (August 6, 2009 Application at 2), Attachment 1.

Durr's request for DNA testing included three separate convictions (each conviction pertaining to a separate female victim). Two weeks prior to the commencement of the underlying capital murder trial, Durr pled guilty to two separate rape offenses, Cuyahoga County Court of Common Pleas Case Nos. CR 229934 and CR 231206.[1] In Case No. 229934, Durr kidnapped an eighteen year-old female off the street at gunpoint then raped her in his car. A Cleveland Police Officer caught Durr in the act of raping the victim and arrested him in a public park only a few hundred feet away from where his murder victim, Angel Vincent, had been dumped. In Case No. 231206, Durr offered a fourteen year-old female a ride home, but instead took her at knifepoint to a vacant apartment where he beat, cut, and raped the victim.

### *Agreed DNA Testing Of Rape Kit Smears*

On September 1, 2009, counsel for both Durr and the State submitted to the Court of Common Pleas an agreed order for conducting post-conviction DNA testing, in which both parties agreed to test any DNA from oral, rectal, and vaginal smears (taken from the victim at the time of autopsy and retained by the Cuyahoga County Coroner) against a DNA sample taken from Durr.

Working with the assistance of the Ohio Attorney General and the Ohio Bureau of Criminal Identification and Investigation ("BCI"), the parties agreed to have the DNA testing conducted by the Laboratory Corporation of America ("LabCorp").  BCI arranged for and facilitated the Labcorp DNA testing, using a grant from the Ohio Attorney General to bear the costs of the tests.   Because the upcoming execution date warranted immediate testing on agreed-upon evidence items that were already available and accounted for, this agreed order was submitted prior to any other responsive pleadings.  The Court of Common Pleas signed the order on September 1, 2009.

On September 16, 2009, the State of Ohio filed a Consolidated Evidence Report and Response to Request for DNA Testing ("Consolidated Report").  The Consolidated Report contained an inventory of any evidence items retained in both the rape and aggravated murder cases from: (1) the Cleveland Police Property Room, (2) the Cuyahoga County Coroner's Office, (3) the Cleveland Police Scientific Investigation Unit, (4) the Eighth District Court of Appeals, (5) the Cuyahoga County Metroparks, (6) the Cuyahoga County Prosecutor's Office, (7) the Cuyahoga County Court Reporter, (8) the Cleveland Police Homicide Unit, and (9) the Cleveland Police Records Department.

The State's investigation, as reflected in the September 16, 2009 Consolidated Report, revealed that no evidence remained from the two separate rape cases.  The Cuyahoga County Coroner's Office had preserved the oral, rectal, and vaginal smears from the victim.  These smears were sent to LabCorp for DNA testing on September 5, 2009.  The Cleveland Police Department Special Investigations Unit had retained scrapings in their custody that had originally been taken from shovels.  The Cleveland Police Department Property Room had retained custody of the shovels as well as the bag those shovels had been found in.  Finally, the Clerk of Courts for the

---

[1]The procedural circumstances of these cases are recited in *State v. Durr*, 1990 WL 118120 (Ohio Ct. App., 1990).

Eighth District Court of Appeals retained a necklace found on the victim's body, which was contained in an unsealed envelope in a box of record exhibits that had been stored with the trial transcript.

In its Consolidated Report, the State did not object to testing of the shovels and any scrapings taken from the shovels, but Durr elected not to pursue testing of these items. The parties disagreed on whether the victim's necklace should be subjected to DNA testing. As a result, the Court of Common Pleas scheduled an evidentiary hearing on October 5, 2009.

On October 1, 2009, the State filed a Motion to Permit Evidence Custodian to Transport Exhibits to Evidentiary Hearing, seeking the Court's permission to have Cuyahoga County Deputy Clerk of Courts Frank Kost transport exhibits in the record, maintained by the clerk, to the October 5 hearing. Attached to (and described in) the motion to transport were the DNA results from Laboratory Corporation of America, documenting the fact that no DNA could be found on oral, rectal and vaginal smears previously submitted for testing.

During the October 5, 2009 hearing, counsel for Durr requested that the Court of Common Pleas order the victim's necklace tested for DNA, and that any DNA profile found on the necklace "be tested against CODIS," a government database of offender DNA profiles maintained by the Federal Bureau of Investigation. (October 5, 2009 Hearing Transcript, "HTR.," at 5, 39-40), Attachment 2. The State opposed Durr's request to test the necklace because the storage of the necklace since the time of trial did not ensure an intact chain of custody, "so even if we test it today and get a results[sic] back, there's no way of knowing if this is even crime scene DNA." (HTR. 10).

### Witness Testimony Regarding Necklace

The State called two witnesses. Cuyahoga County Deputy Clerk of Courts Frank Kost testified that he is the supervisor of what is commonly known as the "dead files" area of the Cuyahoga County Clerk of Courts, where transcripts and trial exhibits are stored after an appeal.

5

(HTR. 11-12). Dead files is located in the basement of the Old County Courthouse on Lakeside Avenue in Cleveland. (HTR. 12). Kost testified that transcripts and trial exhibits are a public record, and it is permissible for lawyers and members of the public to personally examine both. (HTR. 12-13). In Kost's experience, trial exhibits within his control can occasionally consist of physical evidence from murder cases, usually in envelopes. (HTR. 15-16). A member of the public wishing to inspect trial exhibits would be required by policy to sign a log book, then could take the exhibits out into the hallway and inspect them at a table. (HTR. 13-14). The hallway is a high traffic public area within the courthouse. (HTR. 14). Members of the public inspecting trial exhibits may do so unsupervised, using the "honor system." (HTR. 14).

Kost testified that he had brought with him an envelope marked "State's Exhibit 8" to the hearing, which he opened in the presence of the Court. (HTR. 16-17). Kost testified that the envelope was not sealed, and he was able to look inside and describe its contents as being a small silver chain necklace. (HTR. 17-18). Kost identified the contents of State's Exhibit 8 as being the same item depicted in a photograph submitted to the Court of Common Pleas as a documentary exhibit, Slide Number 4. (HTR. 16-17). Kost testified that he had no reason to believe that the condition of State's Exhibit 8 had been altered since trial, and that anyone who had accessed that exhibit since that time would have found it in the same condition. (HTR 18).

Kost testified that in 2004, a couple asked to sign out transcripts and exhibits from dead files in the case of *State of Ohio v. Christopher Miller*, and subsequently took the exhibits. (HTR. 18). The deputy clerk who provided the exhibits did not have the couple sign the log book. (HTR. 18). As recently as October 2, 2009, Kost had discovered in another case that students from the Innocence Project of Ohio had inadvertently signed out and taken trial exhibits back to Cincinnati. (HTR. 20).

Kost testified that the log book policy has been place since 1995. (HTR. 21). Before 1995, there was no documentation of this type. (HTR. 21). Kost testified that unless someone happened

to be walking by at the time, there would have no way of knowing whether someone had physical contact with a trial exhibit in the hallway.  (HTR. 29).

Dr. Elizabeth Benzinger testified that she is the DNA Quality Assurance Administrator for the Ohio Bureau of Criminal Identification and Investigation.  (HTR. 32).  Both parties stipulated to Dr. Benzinger being an expert in the field of forensic DNA analysis.  (HTR. 31).  Dr. Benzinger has worked or consulted on thousands of cases during her career.  (HTR. 33).   Dr. Benzinger testified that she had reviewed the Durr case and had been involved in facilitating the DNA testing of vaginal, anal and oral samples in this case.  (HTR. 33).  Dr. Benzinger had knowledge of the items Durr sought to test for DNA, and had examined photographs of the items.  Specifically, Dr. Benzinger knew that jewelry had been found on the victim's body, which itself had been exposed to the elements in a public park for approximately three months.  (HTR. 34).  Dr. Benzinger testified that she was aware that the item Durr sought for DNA testing "was not sealed in a manner that would protect it from DNA being applied to it."  (HTR. 35).

Dr. Benzinger testified that she was familiar with Ohio's legal requirements for post-conviction DNA testing.  (HTR. 35).  Dr. Benzinger stated that a "parent sample would be the original item that one would obtain a DNA sample from."  (HTR. 35).  In Dr. Benzinger's opinion, "the quality of what would be on it, the chain that was on the body of Angel Vincent which was somewhat decomposed and as such we wouldn't expect to find DNA that would have been applied during the offense.  We wouldn't expect to find that on the chain because the bacteria and fungi from that decomposed body would have destroyed that DNA as well."  (HTR. 36).  "It's telling that the vaginal, anal and oral samples, no DNA at all was obtained from those.  We went ahead and tested for Y-STRs, but the quantity testing showed us that *not even any DNA from the victim was obtained.*"  (HTR. 37, emphasis added).  Dr. Benzinger explained that the absence of human DNA in swabs taken from the victims decomposed body indicated that the necklace, also found on the

7

victim's body, would also not likely contain any DNA from the offense. (HTR. 37-8). Dr. Benzinger explained that she had observed photographs of the body collection, and could see that portions of the victim's body had been exposed to the weather, had blackened, and had been exposed to animal scavenging. (HTR. 55-6).

When asked whether Dr. Benzinger had an opinion about the quality of the necklace as a parent sample under the circumstances of the storage environment, Dr. Benzinger replied: "Given that any DNA that is contemporaneous with the offense would be broken down to the point of not being testable. Any contact, for instance, like we saw today with the witness looking in the envelope and speaking, that is enough contact to apply modern DNA to it, so if we were to obtain any results by DNA testing, I would expect that to be DNA that has been applied since the offense." (HTR. 39). Dr. Benzinger explained that "simply by talking over" the evidence item, enough of a person's DNA can be applied to an item to be detectable using modern DNA testing, and that experts would not be able to rule out post-offense handling by courtroom participants, or any member of the public who had accessed the item, as the source of any DNA found on the necklace. Given the lack of chain of custody and the three-month duration the necklace sat on the victim's decomposing body, Dr. Benzinger testified that the necklace was unsuitable for DNA testing, in her expert opinion. (HTR. 37-41, 56-7).

Durr did not call any witnesses on his behalf during the October 5, 2009 hearing. The necklace remains within the custody and control of the Cuyahoga County Clerk of Courts in an envelope located with the transcript and exhibits from Durr's trial.

On October 6, 2009, the Court of Common Pleas issued an opinion granting in part and denying in part Durr's request for DNA testing. Regarding the swabs taken from the victim at the time of autopsy, the Court of Common Pleas granted Durr's request pursuant to the earlier

stipulation.[2]  (October 6, 2009 Opinion at 3, attached to Durr's Memorandum in Support).  Citing R.C. 2953.76(C) and R.C. 2953.73, the Court of Common Pleas found that "based upon the testimony presented at the evidentiary hearing, that there is reason to believe that the evidence has been out of the State's custody and/or been contaminated since its collection and during its storage in dead files."  (October 6, 2009 Opinion at 3, attached to Durr's Memorandum in Support).

Durr appealed to the Supreme Court of Ohio, which dismissed his appeal on April 5, 2010. *State v. Durr,* OSC Case No. 2009-2117.  Durr has not asked the Supreme Court of Ohio to reconsider its decision dismissing the appeal.

## GROUNDS FOR DISMISSAL

### *Similar, If Not Identical, Claims Made In Durr's Original Habeas Action*

Durr's renewed attack on the validity of his conviction and death sentence is a successive habeas action disguised as a civil rights complaint. A similar attack by Durr was turned down more than a decade ago by Federal District Judge Nugent, in the decision denying habeas corpus relief on Durr's claims of actual innocence and insufficiency of evidence to sustain the rape conviction. See Attachment 3, Excerpts From Opinion and Order Denying Habeas Relief, Case No. 1:96-cv-792, Judge Nugent, US District Court, Northern District Of Ohio, issued November 2, 1999, reference to habeas claim 36 (insufficiency of rape evidence) and claim 38 (actual innocence).

Especially where Durr has raised similar, if not identical, claims in his original habeas corpus action, the lesson of *Nelson v. Campbell*, 541 U.S 637 (2004), is that the Court is obligated in the first instance to determine whether Durr's present civil rights action is a subterfuge to avoid the rigorous second petition rules under 42 USC 2244(b). In *Nelson*, just like in this case, a prisoner had earlier

---

[2]The Court of Common Pleas also listed a "lab coat" in the items approved for testing, which the Court of Common Pleas deleted as a clerical error, nunc pro tunc, in a November 5, 2009 agreed journal entry submitted by the parties.

9

filed an unsuccessful habeas corpus petition attacking his conviction and death sentence. On the eve of execution, the prisoner challenged, by way of a civil rights action under 28 USC Section 1983, the specific method by which he was to be executed. *Id.* at 639 ("Three days before his scheduled execution by lethal injection, petitioner David Nelson filed a civil rights action in District Court, pursuant to *42 USC § 1983* [*42 USCS § 1983*], alleging that the use of a "cut-down" procedure to access his veins would violate the *Eighth Amendment*. Petitioner, **who had already filed one unsuccessful federal habeas application,** sought a stay of execution so that the District Court could consider the merits of his constitutional claim.") (Emphasis added.)  In the *Nelson* case, the Warden contended the action must be brought in habeas as a second petition.

The *Nelson* Court determined the prisoner could bring his claim, which opposed the specific means by which he was to be executed, as a civil rights action, since the prisoner was clearly not attacking the validity of his conviction. *Id.*, at 932 ("Despite its literal applicability, however, *§ 1983* must yield to the more specific federal habeas statute, with its attendant procedural and exhaustion requirements, **where an inmate seeks injunctive relief challenging the fact of his conviction or the duration of his sentence**. [citation omitted]. **Such claims fall within the "core" of habeas corpus and are thus not cognizable when brought pursuant to § 1983.**") (Emphasis added).

In this case, there is no doubt that Durr is attacking the validity of his conviction and death sentence, and is seeking a stay so that he can launch new challenges against his conviction and death sentence. This factor, in context of similar, if not identical, claims made in his first habeas petition, shows this Court should "dismiss the complaint for want of jurisdiction on the grounds that petitioner's *§ 1983* claim and accompanying stay request [are] the 'functional equivalent' of a second or successive habeas application subject to the gatekeeping provisions of *28 U.S.C. § 2244(b)*". *Id.,* at 642.

A similar outcome was reached in *Alley v. Bell*, 178 Fed. Apx. 538 (6th Cir. 2006). In *Alley*, the prisoner had earlier filed an unsuccessful habeas corpus petition. Later, he filed a new challenge under Civil Rule 60(b). The question was not whether Civil Rule 60(b) was a proper vehicle to challenge a habeas judgment. Rather, the question was whether, under the facts of Alley's case, his new attack was properly characterized as a second habeas petition. The decision by the District Court that the prisoner's new action was a repackaged habeas action, and accordingly must be brought under second petition rules, was upheld by the *Alley* Court.

The question in this case, whether Durr's new action is properly characterized as a second habeas petition, does not implicate the abstract question whether Section 1983 can ever be a viable means for a prisoner to obtain DNA testing. The latter question arguably remains open after decision in *District Attorneys Office v. Osborne*, 129 S. Ct. 2308, 2319 (2009) "While we granted certiorari on this question, [whether Osborne's claims could be pursued using *§ 1983*],our resolution of Osborne's claims does not require us to resolve this difficult issue."

However, in *Osborne*, the prisoner had never filed a habeas action at all, where Durr has undoubtedly brought an earlier habeas action raising similar, if not identical claims. This distinguishing factor means the first question before the Court is whether Durr's new attack on the validity of his conviction and sentence, however styled, is in truth a second petition that must be brought pursuant to 28 USC 2244(b). The answer is clear. Cf. *Boyle v. Mayer*, 46 Fed. Appx. 340 (6th Cir. 2006) (Not Recommended For Full Text Publication.).

The habeas record from the sister Court in the Northern District of Ohio will not show a request for DNA testing. However, pursuit of that avenue was as readily available to Durr then as it is now. Consequently, Durr has no viable grounds to distinguish the present day from a decade ago, when he could have brought his present day claims before Judge Nugent in his initial habeas action.

11

Given that Durr's present action is in truth a second habeas petition, it is obvious that the named defendants are not proper parties to this action. In fact, the Court should be most skeptical of Durr's naming as defendants the Attorney General and Governor, both of whom lack sufficient legal connection to the subject matter of the complaint. The Court should note that in an analogous situation the prisoner brought suit against the District Attorney's Office, not the Attorney General or the Governor.  Cf. *District Attorneys Office v. Osborne*, 129 S. Ct. 2308, (2009). This factor, being the questionable naming by Durr as defendants the Attorney General and Governor, should help illustrate to the Court that this action is a subterfuge to avoid the second petition rules under 28 USC 2244(b).

### No Constitutional Right To DNA Testing

Although Durr claims his constitutional rights have been violated because the State courts permitted some, but not all, of his requests for DNA testing, it is now clear that Durr's proposition of law is flawed. The Court in *District Attorney's Office v. Osborne* 129 S. Ct. 2308, (2009) squarely held there is no "right under the *Due Process Clause* to obtain postconviction access to the State's evidence for DNA testing." *Id.* at  2316.  What this means is that Durr's present grievance does not implicate his federal constitutional rights, and thus is not amenable to review by this Court, simply because Durr styles his action as a civil rights complaint. Moreover, to the extent Durr would seek to wrap his DNA testing complaint into his so called "actual innocence" claim, he would have to concede the pertinence of his initial habeas action where he made the same "actual innocence" claim. *Id.* at 2321-2322 ("In this case too we can assume without deciding that such a claim exists, because even if so there is no due process   problem. ***Osborne does not dispute that a federal actual innocence claim (as opposed to a DNA access claim) would be brought in habeas***." (Emphasis added).

12

Although Durr may avoid a concession that his action is really a successive habeas petition, he can not avoid the *Osborne* rule that expressly declined to constitutionalize matters involving DNA testing. Absent this constitutional foundation, Durr's pleadings fail to state grounds for relief.

### No Constitutional Right To Post-Conviction Relief

In similar fashion, Durr makes a legally incorrect claim his rights were deprived under the supposedly flawed Sate court post-conviction procedures he used to secure testing of the rape kit slides. It is ironic that the post-conviction procedures used by Durr to obtain testing of the rape kit slides, are the same as those supposedly woefully inadequate as to the necklace. Apart from Durr's duplicity in claiming constitutional inadequacy of the state court process he used to obtain DNA testing of the rape kit slides, there simply is no federal constitutional right to post-conviction relief. *Pennsylvania v. Finley*, 481 US 551 (1987). Consequently, while Durr may grieve the very same state court process he utilized to secure testing of the rape kit slides, that grievance does not state a claim under the federal constitution. *Kirby v. Dutton*, 794 F.3d 245 (6th Cir. 1986).

Dicta from *Osborne* confirms the proposition that Durr fails to state a claim under the federal constitution regarding the adequacy of the procedures he used to obtain testing of the rape kit slides. In *Osborne*, the prisoner asked for DNA testing, was completely denied that relief, and then challenged the constitutionality of the state court post-conviction process under which he did not receive DNA testing. Even though he did not receive DNA testing at all, the Osborne Court declined the invitation to declare the state procedures constitutionally flawed. *Id.* at 2320. ("We see nothing inadequate about the procedures Alaska has provided to vindicate its state right to postconviction relief in general, and nothing inadequate about how those procedures apply to those who seek access to DNA evidence.")

In this case, Durr utilized state court post-conviction procedures to obtain DNA testing, and he was successful in that regard. At Durr's request, and at no expense to him, the State had DNA

testing done on the rape kit slides. That procedure, utilized by Durr, would not become constitutionally inadequate simply because testing of the necklace was not authorized. Consequently, Durr's pleadings fail to state a claim under the federal constitution and should be dismissed.

### Durr Has Already Received Meaningful Review Of His Postconviction DNA Application, Which The State Court Adjudicated Using A Legal Standard Materially Identical To The Federal Standard

The Ohio Court of Common Pleas has already carefully evaluated Durr's request to test the victim's necklace.  Although the Ohio Court granted Durr's request to test biological material from the victim's body, it held an evidentiary hearing and found that Durr could not satisfy Ohio's statutory requirements for postconviction DNA testing because the necklace did not have an intact chain of custody.  The Ohio Court of Common Pleas applied Ohio Rev. Code § 2953.74(C), which requires in relevant part:

> (C) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if **all** of the following apply:
> * * *
> (c) The parent sample of the biological material so collected has not degraded or been contaminated to the extent that it has become scientifically unsuitable for testing, **and the parent sample otherwise has been preserved, and remains, in a condition that is scientifically suitable for testing**.

(Emphasis added).  The Ohio statute's federal counterpart, 18. U.S.C.A. §3600 (the "Innocence Protection Act" or "IPA") likewise requires in relevant part:

> **(a) In general.**--Upon a written motion by an individual under a sentence of imprisonment or death pursuant to a conviction for a Federal offense (referred to in this section as the "applicant"), the court that entered the judgment of conviction shall order DNA testing of specific evidence if the court finds that **all** of the following apply:
> * * *
> **(4)** The specific evidence to be tested is in the possession of the Government and has been subject to a chain of custody and retained under conditions sufficient to ensure that **such evidence has not been substituted, contaminated, tampered with, replaced, or altered in any respect material to the proposed DNA testing.**

14

Comparing the state and federal postconviction standards, it is clear that the Ohio Court of Common Pleas carefully and reasonably applied a proper legal standard to the evidence in Durr's case. Durr chose not to call any witnesses in his own behalf, and has not demonstrated that the trial court's factual findings were improper or erroneous.

### Durr's Complaint Improperly Seeks Federal Appellate Review Of A State Court Decision

Nor should Durr be allowed to use a Sec. 1983 lawsuit to have this Court conduct basic appellate review of the Ohio Common Pleas Court's decision. Generally speaking, the *Rooker-Feldman* doctrine bars federal district courts from reviewing state court decisions. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 125 S.Ct. 1517 (2005). In *Rooker*, a plaintiff filed a bill of equity in federal district court seeking a declaration that an Indiana circuit court judgment, "which was affirmed by the Supreme Court of the state, [be] declared null and void." *Rooker*, 263 U.S. at 414. The plaintiff argued that the circuit court judgment contravened certain provisions of the United States Constitution. The Supreme Court determined that the "federal district courts lacked jurisdiction to "entertain a proceeding to reverse or modify" a state court judgment, even if said judgment was wrong. *Id.* at 416. The jurisdiction of federal district courts, the Supreme Court explained, is "strictly original" and such courts may not exercise "appellate jurisdiction" over purported erroneous state court judgments. *Id.* Rather, Congress empowered only the Supreme Court to do so. The Supreme Court affirmed the dismissal for lack of jurisdiction.

The Sixth Circuit "has interpreted that limitation to mean that the *Rooker-Feldman* doctrine applies only when a plaintiff complains of injury from the state-court judgment itself." *Carter v. Burns,* 524 F.3d 796, 798 (6th Cir.2008) (internal quotations marks and citation omitted). Here, the source of the alleged injuries in Durr's complaint are the decision of the Ohio Court of Common Pleas to deny his application for postconviction DNA testing of the necklace, and the Supreme

15

Court of Ohio's subsequent dismissal of his appeal. The *Rooker-Feldman* doctrine is squarely applicable in this case because Durr has not elected to appeal the Supreme Court of Ohio's judgment dismissing his postconviction DNA appeal to the United States Supreme Court. Without exception, all of the claims in Durr's complaint could be raised in a writ of certiorari to the United States Supreme Court.

In a similar recent case, the Sixth Circuit held that the *Rooker-Feldman* doctrine applied in a Michigan Case where an inmate filed a § 1983 action against a state prosecuting attorney and judge, alleging that his constitutional rights had been violated by defendants' refusal to order DNA testing in his case. *In re Smith,* 349 Fed.Appx. 12, 2009 WL 3049202 (6th Cir.2009). (Not Recommended For Full Text Publication). The *Smith* Court held that the *Rooker-Feldman* doctrine precluded the inmate's § 1983 due process claim for post-conviction access to DNA testing under applicable state statute, since injury did not exist until prisoner had been denied requested DNA testing by state court. *Id.,* at 14-15. Just as in *Smith,* the injury Durr for which Durr seeks redress is the state court's denial of his requested DNA test under the applicable state statutes. Durr's complaint therefore runs afoul of the *Rooker-Fedlman* doctrine and should be dismissed on that basis alone.

## CONCLUSION

For the reasons expressed, this Court should dismiss Durr's 1983 action and deny his application for TRO, Preliminary Injunction, and Stay of Execution.

    Respectfully submitted,

    **RICHARD CORDRAY**
    **Ohio Attorney Genera**l

      s/Stephen E. Maher
    **STEPHEN E. MAHER\* (0032279)**
    **\****Lead Counsel*
    **THOMAS E. MADDEN\* (0077069)**
    *Co-Counsel*
    **Assistant Attorney Generals**
    Capital Crimes Unit

150 East Gay Street, 16th Floor
Columbus, Ohio 43215
(6l4) 728-7055; (614) 728-8600 (fax)
stephen.maher@ohioattorneygeneral.gov
thomas.madden@ohioattorneygeneral.gov
**COUNSEL FOR DEFENDANTS**
**CORDRAY AND STRICKLAND**

**WILLIAM D. MASON**
**Cuyahoga County Prosecuting Attorney**

s/ Matthew E. Meyer
**MATTHEW E. MEYER (0075253)**
**Assistant Prosecuting Attorney**
Justice Center, Courts Tower
1200 Ontario St.
Cleveland, OH 44113
(216-443-7800)
mmeyer@cuyahogacounty.us
**COUNSEL FOR DEFENDANTS**
**MASON AND FUERST**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Defendants Motion To Dismiss* has been served on this 14th day of April, 2010, via the court's electronic filing system to counsel for plaintiff.

s/Stephen E. Maher
**STEPHEN E. MAHER* (0032279)**
***Lead and Trial Counsel***
**Assistant Attorney General**